WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

```
Toni Huynh, an individual,      )
                                )
              Plaintiff,        )      No. CIV 06-0001-PHX-RCB
                                )
        vs.                     )          O R D E R
                                )
J.P. Morgan Chase & Company,    )
                                )
              Defendant.        )
_____)
```

Plaintiff Toni Huynh, an Asian woman, alleges that she was discriminated against on the basis of her race and gender by her former employer, defendant J.P. Morgan Chase & Company ("JPMC"), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2 *et seq.* Pending before the court is a motion for summary judgment pursuant to Fed. R. Civ. P. 56 by defendant JPMC (doc. 43). Also pending are related motions by JPMC seeking to strike: (1) allegedly "inadmissible evidence" which plaintiff offers in response to this summary judgment motion (doc. 50); and (2) the affidavit of Cinyi[1] Wang, a former JPMC employee

---
[1]   There has been some confusion surrounding the spelling of Ms. Wang's name. Plaintiff refers to "Cin Yi[,]" Resp. (doc. 53) at 1, but the court opts for the spelling from Ms. Wang's own affidavit -- "Cinyi." Plaintiff's Separate Statement of Facts ("PSOF") (doc. 47), exh. 7 (doc. 47-3) thereto (Wang Aff.) at

1  (doc. 48).[2]

2  ***Background***

3       Plaintiff Huynh's discrimination claims arose in the context

4  of a corporate merger between JPMC and Bank One, which occurred in

5  late 2004.   For now the court will limit its recitation of the

6  facts to the general undisputed background of those claims.   More

7  detailed facts will be set forth herein as necessary to resolve the

8  myriad of issues which these motions raise.

9       Plaintiff began working for JPMC's predecessor in June 1998.

10 Sometime in 2004, she was promoted to the position of Vice

11 President/Global Product Manager.   In that position plaintiff was

12 responsible for product and project management with respect to

13 audio and video conferencing products.   Plaintiff would research

14 products and contract with outside vendors to install and support

15 those products.   Given her admitted lack of technical or

16 engineering experience, plaintiff would "delegate" matters

17 pertaining, for example, to "diagnostics."   <u>See</u> Defendant's

18 Separate Statement of Facts ("DSOF") (doc. 44), exh. 1 (doc. 44-2)

19 thereto (Huynh Dep'n) at 47:18-20.

20      Because both JPMC and Bank One had departments which formed

21 the same function as the Technology and Operations Group in which

22 plaintiff worked prior to the merger, "[t]he newly formed JPMC

23 merged th[o]se two departments by assessing the departments, job

24 descriptions, officer titles, salary grade, job functions, and

25 _____

26 19.

27      [2]      Defendant seeks oral argument with respect to its summary judgment
   motion and its "motion to strike inadmissible evidence[,]" but not as to its motion
   to strike the Wang affidavit.   <u>Compare</u> Docs. 43 at 1; and 50 at 1 <u>with</u> Doc. 48.
28 Finding oral argument unnecessary, the court denies these requests.

1  employees and then restructuring the groups to form one

2  department." Id., exh. 6 (doc. 44-5) thereto (McClung Decl'n) at

3  30, ¶ 4.  "The new [JPMC] department adopted the structure of the

4  model previously used by Bank One." Id. Unlike the model under

5  which plaintiff had previously worked, under the Bank One model,

6  there was no "routine[] contract[ing] with [outside] vendors to

7  perform installations or support – these functions were performed

8  primarily" in-house by Bank One employees.  DSOF (doc. 44) at 4, ¶

9  15 (citations omitted).

10     According to Penne McClung, a JPMC Senior Vice President and

11  the Managing Director of Global Voice, and Shannon Morton, a JPMC

12  Vice President, "[a]s part of the merger, some employees were let

13  go and other were reclassified or 're-mapped' into [other]

14  positions[.]" Id., exh. 3 (doc. 44-4) thereto (Morton Decl'n) at 7,

15  ¶ 9; and exh. 6 (doc. 44-5) thereto (McClung Decl'n) at 30, ¶ 5.

16  As part of the reclassification, employees had to complete

17  comprehensive "Employee Biography Forms[]" detailing such things as

18  their educational background, professional experience, and a

19  description of their "most recent job held and preferred role"

20  within the newly merged company.  Id. at 4, ¶ 16 (citation

21  omitted).

22     "After the merger, Plaintiff was placed in the position of

23  Network Engineer II[3][.]" Id. at 4, ¶ 18 (citation omitted)

24  (footnote added).  She no longer held the title Vice President.

25  Plaintiff was not alone in losing her title as part of the merger

26  and subsequent reclassification.  "Nine employees who reported to"

27  _____

28      [3]    Hereinafter all references to "Network Engineer" shall be read as
    including the designation "II."

Ms. Morton, "including [plaintiff], lost their 'vice president' or 'assistant vice president' titles as a result of the" merger. Id., exh. 3 (doc. 44-4) thereto (Morton Decl'n) at 11, ¶ 26; and exh. D thereto at 35.

Plaintiff was reclassified as Network Engineer because from JPMC's perspective, this was the position "most closely aligned with" plaintiff's role pre-merger, and "the available position that required the least technical and engineering skills." Id. at 4, ¶ 19 (citations omitted). As a Network Engineer, plaintiff's salary and benefits remained the same as when she had been a Vice President. Id. at 4, ¶ 20 (citation omitted). Because plaintiff's position prior to the merger did not exist in the JPMC merged organization, the only option, short of termination, was to reclassify her. Id. at 5, ¶ 22 (citations omitted).

In the spring of 2005 a presentation was made to plaintiff's department. Among the items discussed at that presentation were reclassification, training opportunities and the reporting structure were explained. Id., exh. 3 (doc.44-4) thereto (Morton Decl'n) at 6, ¶ 28. Shortly after that presentation, plaintiff informed Ms. McClung, that plaintiff did not think that she had the qualifications to be a Network Engineer. Id., exh. 1 (44-3) thereto (Huynh Dep'n) at 208:10-14. Plaintiff voiced that concern to others at JPMC, including her immediate supervisor, Gerard Bauer. Id. at 208:15-209:6; and DSOF, exh. 5 (doc.44-5) thereto (Bauer Decl'n) at 14, ¶ 13.

In an April 15, 2005, e-mail to Ms. McClung, plaintiff explained that she was "extremely stressed out" because she was being torn between two priority projects. DSOF (doc. 44), exh. 1

-4-

(doc. 44-3) thereto (Huynh Dep'n) at 185:9-186:25.  This prompted a
review of how plaintiff was spending her workdays.  Id. at 7, ¶ 32
(citations omitted).  Through its time tracking system, JPMC
discovered that plaintiff "reported only 73 hours of work related
to her audio and video conferencing activities."  Id. at 7, ¶¶ 33
and 34 (citations omitted).  The remainder of her reported time was
devoted to "volunteer human resources activities that were not
disclosed to her management team."  Id. at 7, ¶ 32 (citations
omitted).  As a result of that e-mail, plaintiff believes that "her
managers were unhappy with her[,]" and in fact, that e-mail is the
reason "she received a rating of below satisfaction" for "technical
competence on her April 29, 2005 performance evaluation."  Id. at
7, ¶¶ 37-38 (citations omitted).

     In the aftermath of the merger, there have been several
reductions in force.  Consequently, "[b]etween January 2005 and the
end of December 2006, 85 employees (not including contractors)
within [plaintiff's] Department were lost . . . , including
[plaintiff] Huynh."  Id., exh. 6 (doc. 44-5) thereto (McClung
Decl'n) at 35-26, ¶ 50.

### _Discussion_

### I. "Motion to Strike Inadmissible Evidence"

     Before turning to JPMC's summary judgment motion and before
further development of the factual record, it is necessary to
clarify the state of the record by addressing JPMC's "motion to
strike inadmissible evidence."  The court will then turn to JPMC's
summary judgment motion.  More narrowly, the court will determine
whether plaintiff can establish a _prima facie_ case of race/gender
discrimination.  Only if plaintiff satisfies that burden will the

court consider JPMC's motion to strike the affidavit of Cinyi Wang. There is no need to address that motion to strike at the outset because plaintiff is offering Ms. Wang's affidavit solely on the issue of pretext.  And, as will be seen, if plaintiff cannot make out a *prima facie* case, pretext does not become an issue.

### *A.  Plaintiff's Affidavits*

In opposing JPMC's summary judgment motion, plaintiff is relying, *inter alia*, upon her own affidavit (doc. 47-3), dated June 14, 2007 - more than a year afer her deposition.  JPMC is moving to strike certain parts of that affidavit due to lack of foundation and lack of personal knowledge.  JPMC further contends that parts of plaintiff's affidavit should be stricken as variously speculative, conclusory, irrelevant, inadmissible hearsay or because she is stating "an ultimate legal conclusion."  See, e.g., id. at 7, ¶ 3.  JPMC also objects to some of plaintiff's averments because supposedly they "are based upon opinion rather than fact."  See, e.g., Mot. (doc. 50) at 6, ¶ 3.  Lastly, JPMC objects to plaintiff's affidavit to the extent she references matters which are not included in her Charge of Discrimination which she filed with the Equal Employment Opportunity Commission ("EEOC") and the Arizona Attorney General's Office, Civil Rights Division on July 20, 2005 ("EEOC Charge").  This argument is more properly made and considered in the context of exhaustion.  Hence, the court will defer consideration of this argument for the moment.

Plaintiff responded to these objections by filing a supplemental affidavit wherein she greatly expands upon each of the challenged portions of her original affidavit.  See, e.g., Resp. (doc. 54) at 5-6, ¶ 2.  Tellingly, plaintiff does not directly

1  confront any of JPMC's objections to her original affidavit.
2  Instead, without distinguishing between her original and her
3  supplemental affidavits, plaintiff simply asserts that the
4  "[a]verments in [h]er [a]ffidavit [a]re [a]dmissible[.]" Id. at 4.
5      JPMC counters that plaintiff's supplemental affidavit, filed
6  almost two months after the filing of her response to JPMC's
7  summary judgment motion, and without leave of court, is untimely.
8  JPMC reasons that "[a] motion to strike inadmissible evidence does
9  not re-open the briefing or record on a summary judgment motion[.]"
10 Reply (doc. 57) at 3.  Nor does such a motion "extend Plaintiff's
11 time to submit the evidence that she claims mandates a trial of
12 this matter." Id.  JPMC thus maintains that the court should
13 strike this supplemental affidavit in its "entirety." Id.
14     JPMC's position is well-taken.  Plaintiff's filing of a
15 supplemental affidavit well after the filing of her affidavit
16 opposing summary judgment is a transparent attempt to circumvent
17 Fed. R. Civ. P. 56 which the court will not allow.  "Parties are
18 not permitted to file late affidavits in support of their
19 opposition to a motion for summary judgment without invoking
20 Fed.R.Civ.Proc. 56(f) and indicating why they cannot timely file
21 the required affidavits." Claar v. Burlington Northern R. Co., 29
22 F.3d 499, 504 (9th Cir. 1994) (citation omitted).  Plaintiff did
23 not invoke Rule 56(f).  Nor did she "suggest[] any reason for [her]
24 failure to file timely, acceptable affidavits." See id.  Indeed,
25 it is hard to conceive of any such reason given that the
26 supplemental affidavit is from plaintiff herself.  This is not a
27 situation, for example, of newly discovered evidence, or where
28 plaintiff had to obtain an affidavit from someone outside of her

control.   Thus, the court grants JPMC's motion to the extent it is seeking to strike the supplemental affidavit of plaintiff.   The court will not consider that affidavit in ruling on this summary judgment motion.

Turning to JPMC's challenges to plaintiff's initial affidavit, there is no need to separately address each one of those numerous challenges because many are unnecessary.   The court is keenly aware that it "may only consider admissible evidence in ruling on a motion for summary judgment."   Ballen v. City of Redmond, 466 F.3d 736, 745 (9th Cir. 2006) (citation omitted).   The court is equally cognizant of the fact that the Ninth Circuit has long recognized that "[d]efects in evidence submitted in opposition to a motion for ... summary judgment are waived 'absent a motion to strike or other objection.'"   FDIC v. N.H. Ins. Co., 953 F.2d 478, 484 (9th Cir. 1991) (quoting Scharf v. U.S. Att'y Gen., 597 F.2d 1240, 1243 (9th Cir. 1979)).   By the same token, objections such as JPMC is making that "evidence ... [as] irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself[.]" Burch v. Regents of University of California, 433 F.Supp.2d 1110, 1119 (E.D.Cal. 2006).

"A court can award summary judgment only when there is no genuine dispute of *material* fact. It cannot rely on irrelevant facts, and thus relevance objections are redundant."   Id. Similarly, JPMC's objections that certain averments are speculative or constitute improper legal conclusions, are "superfluous in this context[ ]" because such averments "are not facts and likewise will not be considered on a motion for summary judgment." Id. (citation

1   omitted). As the court accurately observed in <u>Burch</u>, "[i]nstead of

2   objecting[,] parties should simply argue that the facts are not

3   material." <u>Id.</u>  In light of the foregoing, suffice it to say that

4   the court will only take into account those parts of plaintiff's

5   original affidavit which are properly considered on this summary

6   judgment motion.  The court will disregard the rest of that

7   affidavit.

8       ***B. Plaintiff's Separate Statement of Facts***

9       JPMC is seeking to strike 26 of the 61 paragraphs in the PSOF,

10  as well as portions of three other paragraphs.  Much like it did

11  with respect to plaintiff's affidavit, this aspect of JPMC's motion

12  to strike is based upon a host of claimed deficiencies, which

13  include: (1) lack of foundation; (2) irrelevancy; (3) inadmissible

14  hearsay; (4) argumentative; and (5) speculative.  Once again,

15  insofar as these objections are duplicative of the summary judgment

16  standard, the court sees no need to expressly rule on each of them.

17  Of course, to the extent that the PSOF contains conclusory or

18  otherwise inadmissible "facts" under the summary judgment standard,

19  the court will not consider any of those claimed "facts."

20      ***C.  LRCiv 56.1(b)***

21      LRCiv 56.1(b) requires a party opposing summary judgment such

22  as plaintiff Huynh to provide, among other things:

23              a statement, . . . , setting forth . . . for
            each paragraph of the moving party's separate
24          statement of facts, a correspondingly numbered
            paragraph indicating whether the party disputes
25          the statement of fact set forth in that paragraph
            and a reference to the specific admissible portion
26          of the record supporting the party's position if
            the fact is disputed[.]

27

28  LRCiv 56.1(b)(1).  That Rule further provides that "[e]ach numbered

paragraph of the statement of facts set forth in the moving party's separate statement of facts *shall, unless otherwise ordered*, be deemed admitted for purposes of the motion for summary judgment if not specifically controverted by a correspondingly numbered paragraph in the opposing party's separate statement of facts."
Id. (emphasis added).

Plaintiff Huynh did not comply with that Rule.  Thus, the court could deem admitted JPMC's entire 128 paragraph Statement of Facts.  However, given the phrase, "unless otherwise ordered," the court finds that it "has the discretion, but is not required, to deem the uncontroverted facts admitted."  See Baker v. D.A.R.A. II, Inc., 2008 WL 80350, at *3 (D.Ariz. 2008).  Even without a specific statement of controverting facts from plaintiff, for the most part, the court is able to discern the disputed facts.  Where it could not easily do so, however, the court did invoke LRCiv. 56.1(b)(1) and deem those facts admitted.  Proceeding in this way is consistent with the well accepted view that "a district court does not have a duty to search for evidence that would create a factual dispute."  See Bias v. Moynihan, 508 F.3d 1212, 1219 (9th Cir. 2007) (citing Carmen v. S.F. Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001) (holding that it would be "unfair" to the district court to require it "to search the entire record" if a party fails to "disclose where in the record the evidence for [the factual claims] can be found")).

## II.  Title VII Discrimination Claims

### A.  Summary Judgment Standards

Pursuant to Fed. R. Civ. P. 56(c), a party is entitled to summary judgment "if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the
affidavits, if any, show that there is no genuine issue as to any
material fact and that the moving party is entitled to a judgment
as a matter of law."  It is beyond dispute that "[t]he moving party
bears the initial burden to demonstrate the absence of any genuine
issue of material fact."  <u>Horphag Research Ltd. v. Garcia</u>, 475 F.3d
1029, 1035 (9th Cir.2007) (citation omitted).  "Once the moving
party meets its initial burden, . . . , the burden shifts to the
nonmoving party to set forth, by affidavit or as otherwise provided
in Rule 56, specific facts showing that there is a genuine issue
for trial."  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248
(1986) (internal quotation marks and citations omitted).  This
"[e]vidence must be concrete and cannot rely on mere speculation,
conjecture, or fantasy."  <u>Bates v. Clark County</u>, 2006 WL 3308214,
at * 2 (D.Nev. Nov. 13, 2006) (internal quotation marks and
citation omitted).  Similarly, a mere scintilla of evidence is not
sufficient "to defeat a properly supported motion for summary
judgment; instead, the nonmoving party must introduce some
'significant probative evidence tending to support the complaint.'"
<u>Fazio v. City & County of San Francisco</u>, 125 F.3d 1328, 1331 (9th
Cir. 1997) (quoting <u>Anderson</u>, 477 U.S. at 249, 252).  Thus, in
opposing a summary judgment motion it is not enough to simply show
that there is some metaphysical doubt as to the material facts.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
586 (1986) (citations omitted).

     By the same token though, when assessing the record to
determine whether there is a "genuine issue for trial," the court
must "view the evidence in the light most favorable to the

1  nonmoving party, drawing all reasonable inferences in h[er] favor."

2  <u>Horphag</u>, 475 F.3d at 1035 (citation omitted).  "Nevertheless,

3  inferences are not drawn out of the air, and it is the opposing

4  party's obligation to produce a factual predicate from which the

5  inference may be drawn."  <u>Yang v. Peoples Benefit Ins. Co.</u>, 2007 WL

6  1555749, at *7 (E.D.Cal. May 25, 2007) (citations omitted).

7       On a summary judgment motion, the court may not make

8  credibility determinations; nor may it weigh conflicting evidence.

9  <u>See</u> <u>Anderson</u>, 477 U.S. at 255.  Thus, as framed by the Supreme

10  Court, the ultimate question on a summary judgment motion is

11  whether the evidence "presents a sufficient disagreement to require

12  submission to a jury or whether it is so one-sided that one party

13  must prevail as a matter of law."  <u>Id.</u> at 251-52.

14  In the employment discrimination context, the Ninth Circuit

15  has stressed that "[a] plaintiff . . . need produce very little

16  evidence in order to overcome an employer's motion for summary

17  judgment."  <u>Team Electric</u>, 520 F.3d at 1089 (internal quotation

18  marks and citation omitted).

19       ***B.  Disparate Treatment***

20       Under Title VII it is "an unlawful employment practice

21  for an employer . . . to fail or refuse to hire or to discharge any

22  individual, or otherwise to discriminate against any individual

23  with respect to h[er] compensation, terms, conditions, or

24  privileges of employment, because of such individual's *race*, color,

25  religion, *sex*, or national origin[.]" 42 U.S.C. § 2000e-2(a)(1)

26  (West 2003) (emphasis added).  In her complaint plaintiff Huynh

27  alleges two counts of discrimination - one based upon her race -

28  Asian - and the other based upon her gender - female.  Because

1  these claims mirror each other, the court will jointly analyze

2  them.

3       What is implicit in her complaint, that plaintiff is claiming

4  disparate treatment, she makes explicit in her response.  See Resp.

5  (doc. 46) at 7.  "A person suffers disparate treatment in h[er]

6  employment when . . . she is singled out and treated less favorably

7  than others similarly situated on account of a protected

8  characteristic." Cornwell v. Electra Cent. Credit Union, 439 F.3d

9  1018, 1028 (9th Cir. 2006) (internal quotation marks and citations

10 omitted).  "To prevail in a disparate treatment claim, a plaintiff

11 must 'prove that the employer acted with conscious intent to

12 discriminate.'" Rutenschroer v. Starr Seigle Communications, Inc.,

13 484 F.Supp.2d 1144, 1151 (D.Hawai'i 2006) (quoting Costa v. Desert

14 Palace, Inc., 299 F.3d 838, 854 (9th Cir. 2002) (other citation

15 omitted).

16      Plaintiff's Title VII disparate treatment claims are subject

17 to the by now familiar three step burden shifting analysis of

18 McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  "Under this

19 framework, the plaintiff first must establish a *prima facie* case of

20 discrimination[.]" Surrell v. California Waterservice Co., 518 F.3d

21 1097, 1105 (9th Cir. 2008)(citation omitted).  Alternatively, "[a]

22 plaintiff may . . . proceed by simply producing direct or

23 circumstantial evidence that a discriminatory reason more likely

24 than not motivated the employer." Id. (internal quotation marks

25 and citation omitted).  In the present case, plaintiff declares

26 that she "has direct evidence of discrimination[,]" but nowhere

27 does she identify that evidence.  Resp. (doc. 46) at 7.  Instead,

28 as did JPMC, she employs the McDonnell Douglas framework.

- 13 -

1   Consequently, in its analysis the court, too, will apply that

2   burden shifting framework.

3        **C.  *Prima Facie Case***

4        As the Ninth Circuit recently reiterated, to establish a *prima*

5   *facie* case of disparate treatment, a plaintiff must show that:

> (1) she belongs to a protected class;
> (2) she was qualified for her position;
> (3) she was subject to an adverse employment
> action; and
> (4) similarly situated individuals
> outside her protected class were treated more
> favorably.

10  Davis. v. Team Electric Co., 520 F.3d 1080, 1089 (9th Cir. 2008)

11  (citation omitted).  JPMC expressly concedes that plaintiff, an

12  Asian female, is a member of a "protected class[.]"  Mot. (doc. 43)

13  at 9.  JPMC does not, however, mention the second *prima facie*

14  element – whether plaintiff is qualified.  For purposes of this

15  motion only, the court will assume that JPMC is conceding that

16  plaintiff has met this element as well.  In contrast, JPMC

17  unequivocally asserts that plaintiff cannot establish a *prima facie*

18  case of discrimination because she cannot satisfy the third element

19  – that she was subjected to an adverse employment action.  Nor,

20  JPMC contends, can plaintiff show that there were other similarly

21  situated individuals, outside her protected class, *i.e.* who were

22  not female and Asian, who were treated more favorably than her.

23  Accordingly, the court will confine its analysis of a *prima facie*

24  case to these two challenged elements.

25        **1.  *Scope of Claims***

26        Before doing so, for two reasons, it is necessary to clarify

27  the scope of plaintiff's claims.  First, JPMC interprets

28  plaintiff's response as attempting to impermissibly expand the

scope of her recovery to include claims for her termination and for
her unsuccessful attempts to transfer to other positions within
JPMC.   Second, plaintiff mentions retaliation and includes an EEOC
Charge, filed on February 8, 2006, wherein she expressly states her
"belie[f] that she was "retaliated against for filing a prior
charge of discrimination with the [EEOC]."   PSOF (doc. 47), exh. 9
(doc. 47-3) thereto at 24.   It is therefore possible to construe
plaintiff's response as seeking to recover for unlawful retaliation
as well.   The court will consider *seriatim* whether these additional
claims are properly before it.

### a.   Termination and Transfer

     JPMC's argument that plaintiff is impermissibly seeking to
expand the scope of her claims is two-fold.   First, JPMC asserts
that plaintiff did not file an EEOC Charge pertaining to either her
termination or her attempts at internal transfers.   Second, JPMC
argues that those "alleged events occurred on or before July
2006[,]" and thus are time barred.   Resp. (doc. 49) at 2.

     An extremely generous reading of plaintiff's response could
lead to the conclusion, as did JPMC, that she is seeking to recover
for her termination.   See Resp. (doc. 46) at 6 (citations omitted).
The same does not hold true, however, concerning alleged transfer
denials.

     As support for its view that plaintiff is trying to proceed on
the theory that "she sought a transfer to other positions for which
less qualified white male[s] . . . were hired[,]" JPMC cites to a
portion of its letter in response to the February 8, 2006, EEOC
Charge.   See Reply (doc. 49) at 2 (citation omitted).   What the
quoted part of that letter actually states, though, is that during

1  the 60 day notice period, plaintiff "may apply for other positions

2  within JPMC." PSOF (doc. 47) at 12, ¶ 59 (internal quotation marks

3  and citation omitted).  There is no mention in the cited reference

4  of plaintiff seeking a transfer "to other positions for which less

5  qualified white male[s] . . . were hired."  See id.  Thus, although

6  it is possible to construe plaintiff's Response as seeking to

7  recover for her termination, that Response does not encompass a

8  "transfer" claim.  That, combined with the fact that the complaint

9  does not allege any transfer denials compels a finding that

10 transfers are beyond the scope of this action.

11                          *I.  Exhaustion*

12       As previously noted, JPMC is taking the position that

13 plaintiff cannot pursue a termination claim because she did not

14 file an EEOC Charge in that regard.  Blurring the distinction

15 between subject matter jurisdiction and the statute of limitations,

16 JPMC does not explicitly mention exhaustion.  Implicit in JPMC's

17 argument, however, is that because plaintiff did not file such a

18 charge, she has not exhausted her administrative remedies.

19 Therefore, this court lacks subject matter jurisdiction over any

20 termination claim.

21       "To establish subject matter jurisdiction over h[er] Title VII

22 . . . claim[s], [plaintiff] must have exhausted h[er]

23 administrative remedies by filing a timely charge with the EEOC."

24 See Vasquez v. County of Los Angeles, 349 F.3d 634, 644 (9th Cir.

25 2003) (footnote omitted).  "Subject matter jurisdiction extends to

26 all claims of discrimination that fall within the scope of the

27 EEOC's actual investigation or an EEOC investigation that could

28 reasonably be expected to grow out of the charge."  Id. (footnote

1  and citation omitted).  "In determining whether the exhaustion
2  requirement has been satisfied, the court may consider such factors
3  as the alleged basis of the discrimination, dates of discriminatory
4  acts specified within the charge, and any locations at which
5  discrimination is alleged to have occurred."  Oshilaja v.
6  Watterson, 2007 WL 2903029, at *5 (D.Ariz. 2007) (internal
7  quotation marks and citations omitted).  "When examining these
8  factors, the Ninth Circuit deems '[t]he crucial element of a charge
9  of discrimination' to be 'the factual statement contained
10 therein.'"  Id. (quoting Freeman v. Oakland Unified School District,
11 291 F.3d 632, 636 (9th Cir. 2002)).

12      In the present case, plaintiff filed her first EEOC Charge on
13 July 20, 2005.  DSOF, exh. 7 (doc. 44-5) thereto at 38; and PSOF,
14 exh. 8 (doc. 47-3) thereto at 22.  Termination is not mentioned
15 anywhere in that Charge.  Indeed, because the date of that Charge
16 is July 20, 2005, and plaintiff's termination was not until almost
17 a year later, on July 9, 2006, it would have been impossible for
18 that termination to have been within the purview of the first EEOC
19 Charge.  Put differently, an EEOC investigation of plaintiff's
20 first Charge could not "reasonably be expected" to include her
21 termination.  See Vasquez, 349 F.3d at 645 ("The EEOC could not
22 have investigated that incident because it had not yet happened at
23 the time the EEOC was conducting its investigation.") Thus,
24 "[b]ecause [plaintiff] did not present the legal theory of unlawful
25 [termination], and the operative facts regarding this part of h[er]
26 claim were not related to the facts in the [first] EEOC charge,
27 [s]he did not exhaust h[er] administrative remedies."  Id.
28 (footnote and citation omitted).  Accordingly, to the extent she

1  now is attempting to recover for unlawful termination, plaintiff

2  Huynh did not exhaust her administrative remedies.  The court is

3  thus without subject matter jurisdiction to consider such a claim.

4  See id.  Given the lack of subject matter jurisdiction, there is no

5  need to address JPMC's further contention that this termination

6  claim is time barred.

7       For slightly different reasons, the court also lacks subject

8  matter jurisdiction to consider plaintiff's claim that she was

9  retaliated against for filing her first EEOC Charge.  The complaint

10  references only the July 20, 2005, EEOC Charge.[4]  Co. (doc. 1) at

11  5, ¶ 17.  Significantly, in that Charge, in the box entitled

12  "DISCRIMINATION BASED ON[,]" which instructs "Check appropriate

13  box(es)[,]" plaintiff only checked the "RACE" and "SEX" boxes.

14  DOSF (doc. 44), exh. 7 thereto (doc. 44-5) at 38.  Despite the fact

15  that there is a box specifically labeled, "RETALIATION," plaintiff

16  did not check that box, although she did in her second EEOC Charge.

17  Compare id. with PSOF (doc. 47), exh. 9 thereto (doc. 47-3) at 24.

18  For that reason, among others, the court must decide whether this

19  retaliation claim is reasonably related to plaintiff's first EEOC

20  Charge.

21       Two reasons compel a finding that plaintiff did not exhaust

22  her administrative remedies with respect to retaliation, and hence

23  

24       [4]    Plaintiff did not even allege in a conclusory form that she exhausted
her administrative remedies in terms of this particular EEOC Charge.  Instead, she
alleges that she filed an EEOC Charge on July 20, 2005, and that she "received a

25  Dismissal and Notice of Right to Sue on or about October 7, 2005."  See Co. (Doc.
1) at 5, ¶ 17.  Plaintiff did not attach to her complaint either that Charge or the

26  resultant Right to Sue Notice, which would have been preferable.  Regardless,
partially because in its answer JPMC explicitly "states that the EEOC issued a
Dismissal and Right to Sue dated October 5, 2005[,]" Answer (doc. 9) at 3, ¶ 17,

27  and because JPMC is not asserting failure to exhaust with respect to claims arising
from the first EEOC charge, the court will overlook plaintiff's manner of pleading

28  exhaustion in terms of the first EEOC Charge.

1   the court does not have subject matter jurisdiction to consider
2   this particular claim.  First, as just noted, in the first EEOC
3   Charge, which is the only one plaintiff mentions in her complaint,
4   she did not check the box marked "RETALIATION[.]" Likewise, the
5   factual statement in that first Charge does not mention
6   retaliation; nor does it include any operative facts which would
7   alert the EEOC that plaintiff is arguing retaliation in violation
8   of Title VII.  See Ong v. Cleland, 642 F.2d 316, 319 (9th Cir.
9   1981) (an EEOC charge must alert the agency to the legal theory
10  being pursued and the operative facts in relation thereto).
11       Second, based upon the statement of "PARTICULARS" in the
12  second EEOC Charge, it appears that the alleged retaliation took
13  the form of plaintiff receiving a less than favorable job
14  performance rating.  That rating was not issued until February 1,
15  2006, however – well after the July 20, 2005, filing date of the
16  first EEOC Charge.  See PSOF, exh. 9 (doc. 47-3) thereto at 24.
17  Therefore, this purported retaliation "did not occur within the
18  time frame of the events alleged in the [first] EEOC charge." See
19  Vasquez, 349 F.3d at 645.  As a result, "[a] reasonable
20  investigation by the EEOC" of plaintiff Huynh's first Charge "would
21  not have encompassed these allegedly retaliatory acts." See id.
22  Similarly, as with plaintiff's termination claim, the EEOC could
23  not have investigated this alleged retaliation when it was
24  conducting its investigation of the first Charge because that
25  "retaliation" had not yet occurred when the EEOC was conducting its
26  first investigation.  See id. For these reasons, the court also
27  finds that plaintiff did not exhaust her administrative remedies
28  insofar as she is claiming that JPMC retaliated against her for

1  filing her first EEOC Charge.  In sum, the court finds that

2  plaintiff's claims for termination and retaliation arising from the

3  filing of her first EEOC Charge are not properly before it due to

4  her failure to exhaust.  With that clarification, the court will

5  next examine whether plaintiff has shown an adverse employment

6  action – the third element of a *prima facie* disparate treatment

7  claim.

8  **2.  *"Adverse Employment Action"***

9      In her complaint plaintiff alleges that she was "the only

10  female and only minority amongst her immediate peers [who] was

11  demoted" from a Vice President to a Network Engineer as a result of

12  the merger.  Co. (doc. 1) at 3, ¶ 12.  Further, plaintiff alleges

13  that she was not qualified to be a Network Engineer; and when she

14  sought training for that position, it was denied, even though

15  others were provided with that same training.  See id. at 4, ¶ 13.

16  Additionally, plaintiff claims that she was "denied . . . tangible

17  employments benefits that were provided to her peers," such as a

18  corporate credit card and tuition reimbursement.  See id. at 6, ¶

19  24.  In a similar vein, plaintiff alleges that she "observed that

20  her peers . . . were not required to pay for business travel

21  expenses out of their own pocket[s][,]" yet she was.  Id. at 4, ¶

22  14.  Plaintiff also alleges that she was "denied access to

23  management[.]" Id. at 4, ¶ 15.  JPMC contends that none of those

24  acts "adversely effect[ed] the terms, conditions, or benefits of

25  Plaintiff's employment."  Mot. (doc. 43) at 10.  Hence, plaintiff

26  cannot make out a *prima face* case of disparate treatment.

27      Plaintiff counters that the acts enumerated above all easily

28  fit with the Ninth Circuit's "expansive view of . . . 'adverse

1  employment action[s][.]'" Resp. (doc. 46) at 9 (citations omitted).

2  Additionally, plaintiff recites a litany of other acts, most of

3  which are not in her complaint, which she also believes constitute

4  "adverse employment actions" because they were "changes in the

5  terms, conditions and privileges of [her] employment" post-merger.

6  See id. at 10-11.  Therefore, from plaintiff's standpoint, she

7  easily satisfies the "adverse employment action" element.

8       JPMC retorts that in arguing for an "expansive definition" of

9  "adverse employment action," plaintiff is "confus[ing] the

10 prerequisites of a prima facie case of retaliation with those [of]

11 a prima facie case of discrimination."  Reply (doc. 49) at 3

12 (footnote omitted).  Comparatively, the definition of adverse

13 employment action is broader under Title VII's anti-retaliation

14 provision than it is under the substantive (status-based) anti-

15 discrimination provision  of that statute.  See Burlington N. &

16 S.F.R. Co. v. White, 548 U.S. 53, 61 (2006) (internal quotation

17 marks and citations omitted) (a plaintiff invoking Title VII's

18 anti-retaliation provision "must show that a reasonable employee

19 would have found the challenged action materially adverse, which in

20 this context means it well might have dissuaded a reasonable worker

21 from making or supporting a charge of discrimination[]").  Despite

22 that, as will be seen, it does not necessarily follow, as JPMC

23 urges, that none of JPMC's alleged conduct amounts to an adverse

24 employment action.

25      In Fonseca v. Sysco Food Services of Arizona, Inc., 374 F.3d

26 840 (9th Cir. 2004), the plaintiff alleged discrimination in

27 violation of Title VII based on his race and ethnicity; he did not

28 rely on the anti-retaliation provision of that Act.  Nonetheless,

1    Ninth Circuit reiterated that it "define[s] 'adverse employment
2    action' broadly." Id. at 847 (citations omitted). "[A]n adverse
3    employment action is one that 'materially affect[s] the
4    compensation, terms, conditions, or privileges of . . .
5    employment." Team Electric, 520 F.3d at 1089 (internal quotation
6    marks and citations omitted). The broad scope of that definition
7    is evidenced by the fact that adverse employment actions can take
8    many and varied forms. Representative examples, as identified by
9    the Fonseca Court, are "where an employer's action negatively
10   affects its employee's compensation." Fonseca, 374 F.3d at 847
11   (citations omitted). "A warning letter or negative review also can
12   be considered an adverse employment action." Id. (citation
13   omitted). Similarly, the Supreme Court in Burlington Industries,
14   Inc. v. Ellerth, 524 U.S. 742 (1998), explained that an adverse,
15   "tangible employment action constitutes a significant change in
16   employment status, such as hiring, firing, failing to promote,
17   reassignment with significantly different responsibilities, or a
18   decision causing a significant change in benefits." Id. at 761
19   (citing cases). Keeping these principles firmly in mind, the court
20   will separately consider whether any of the acts of which plaintiff
21   complains can be deemed adverse employment actions.

22                    **a.  *"Demotion"***

23       JPMC readily acknowledges that plaintiff's "job title and
24   officer title changed as a result of [the] corporate merger." Mot.
25   (doc. 43) at 10 (citation omitted). However, JPMC maintains that
26   plaintiff's "salary, benefits, and job function remained
27   essentially the same[,]" accordingly, her reclassification was not
28   an adverse employment action. See id. (citations omitted).

1   Plaintiff counters that because her "new position was a non-
2   managerial, non-officer position for which [she] had no knowledge,
3   experience, or training, and for which she was not qualified[,]"
4   she has shown an "adverse employment action."  Resp. (doc. 46) at
5   8-9 (citations omitted).

6        Based upon the record as presently constituted, there is no
7   dispute that plaintiff's salary and benefits did not change, even
8   after her title did.  A JPMC Vice President expressly declared that
9   after plaintiff's reclassification, her "salary and benefits
10  remained the same."  DSOF, exh. 3 (doc. 44-4) thereto (Morton
11  Decl'n) at 4, ¶ 19.  Plaintiff is silent as to whether or not her
12  salary and benefits remained the same.  Presumably then, plaintiff
13  is not disputing this point.  In any event, she has not
14  "designate[d] *specific facts* showing that there is a genuine issue
15  for trial[]" in terms of her compensation and benefits.  See
16  Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91
17  L.Ed.2d 265 (1986) (internal quotation marks omitted) (emphasis
18  added).  Consequently, plaintiff cannot defeat summary judgment on
19  this basis.

20       Plaintiff thus is left with her argument, albeit implicit,
21  that due to changed job responsibilities, she has shown an adverse
22  employment action because the "terms and conditions of her
23  employment" were "materially affected" upon her reclassification.
24  As noted above, JPMC asserts that there was no such change and that
25  her "job function remained essentially the same[.]" Mot. (doc. 43)
26  at 10 (citing DSOF (doc. 44) at ¶ 20).  Significantly, the cited
27  reference does not mention plaintiff's job functions.  This is a
28  critical omission.

1   JPMC, as the party seeking summary judgment always bears the
2   initial burden of establishing the absence of a genuine issue of
3   material fact. <u>Celotex</u>, 477 U.S. at 323.  If the moving party
4   fails to discharge that initial burden, summary judgment must be
5   denied and the court need not consider the nonmoving party's
6   evidence.  <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 159-60, 90
7   S.Ct. 1598, 26 L.Ed.2d 142 (1970).  JPMC has not met its initial
8   burden in terms of whether plaintiff's job reclassification
9   amounted to an adverse employment action.  In contrast to salary
10  and benefits, JPMC has not pointed to any record proof to support
11  its view that plaintiff's job responsibilities "remained
12  essentially the same" upon her reclassification.  <u>See</u> Mot. (doc.
13  43) at 10 (citation omitted).  This statement of counsel,
14  unsupported by record proof, is not a sufficient basis upon which
15  to grant summary judgment.  <u>See</u> <u>Smith v. Mack Trucks</u>, 505 F.2d
16  1248, 1249 (9th Cir. 1974) ("Statements of counsel, whether in
17  legal memoranda or elsewhere, are not evidence and may not be
18  relied on to either support or defeat a motion for summary
19  judgment.")
20      "[R]eassignment with significantly different responsibilities"
21  can constitute an adverse employment action.  <u>Tudor Delcey v. A-</u>
22  <u>Dec, Inc.</u>, 2008 WL 123855, at *8 (D.Or. 2008) (quoting, *inter alia*,
23  <u>Burlington Indus.</u>, 524 U.S. at 761).  Accordingly, because JPMC did
24  not meet its initial burden of showing that plaintiff's job
25  responsibilities "remained essentially the same," summary judgment
26  is not proper as to this alleged form of adverse employment action.
27  Further, at this juncture plaintiff can also rely upon the loss of
28  her Vice President title to bolster her argument that her

reclassification is tantamount to an adverse employment action.
See Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th
Cir. 1993) (emphasis added) ("A materially adverse change might be
indicated by a termination of employment, a *demotion evidenced by a
decrease in wage or salary, less distinguished title*, a material
loss of benefits, significantly diminished material
responsibilities, or other indices that might be unique to a
particular situation."); see also Acosta, 2006 WL 3499963, at *9
("[a]lthough he apparently continued to receive the same salary[,]"
plaintiff made a *prima facie* showing, defeating summary judgment,
that his transfer was an adverse employment action where he was
"demoted from his status as a trades helper[]").  On the other
hand, as will soon become evident, there is merit to JPMC's
argument that the remaining acts are not adverse employment actions
for purposes of imposing Title VII liability.

### b.  *Training*

        Plaintiff declares that she "requested technical training for
her new position and was nearly entirely denied any training while
her colleagues in the same position were consistently provided
training."  Resp. (doc. 46) at 10.  This argument is deficient in
two ways.  First, it is wholly unsubstantiated.  Second, the
undisputed facts belie plaintiff's version of events.

        Plaintiff acknowledges that on July 21, 2005, several months
after being informed of her new job title, she was notified of six
upcoming training sessions.  DSOF (doc. 44) at 11, ¶ 63 (citing
exh. 1 (doc. 44-2) thereto (Huynh Dep'n) at 258:19-259:8).
Somewhat inconsistently, plaintiff testified that she did not
recall attending five of those sessions, but that she "was trying

1   to attend as many as [she] could."  Id., exh. 1 (doc. 44-2) thereto

2   (Huynh Dep'n) at 259:23-24.  Plaintiff candidly offered that

3   "sometimes" she had "scheduling conflicts" so she could not always

4   attend these offered training sessions.  Id. at 259:24-25.

5        Plaintiff also requested and received approval to attend

6   another training session.  DSOF (doc. 44) at 12, ¶ 65 (citing exh.

7   1 (doc. 44-2) thereto (Huynh Dep'n) at 286:6-287:20).  She decided

8   not to attend that particular session, however, because at the time

9   she was not working on any projects using the technology which was

10  to be the subject of that training.[5]  Id. (citing exh. 1 (doc. 44-

11  2) thereto (Huynh Dep'n) at 286:12-287:4).

12       Besides those formal training sessions, Huynh's immediate

13  supervisor "attempt[ed] to assign [her] projects to . . . help her

14  learn the engineering and technical aspects of her new role[]" as

15  Network Engineer.  Id., exh. 5 (doc. 44-5) thereto (Bauer Decl'n)

16  at 16, ¶ 24.  Plaintiff "did not perform th[o]se tasks[]" though

17  and so did not avail herself of the learning opportunities which

18  they presented.  Id. at 16, ¶ 26.  Consistent with the foregoing

19  plaintiff readily agreed that she probably mentioned to her

20  supervisor and to her mentor that she had "no desire to be a

21  technician[,]" and that she had "no desire to learn to succeed as a

22  technician or to acquire those skill sets[.]"  Id., exh. 1 (doc.

23  44-2) thereto (Huynh Dep'n) at 159:12-17; and at 160:5-11.  Indeed,

24  plaintiff opined to her supervisor that it did not "make sense"

25  financially for JPMC to "basically educate a nontechnical person

27      [5]     JPMC further contends that nine other training classes were "made
28  available to Plaintiff."  DSOF (doc. 44) at 12, ¶ 64 (citation omitted).  The court
    is disregarding this contention, however, because the cited excerpt from
    plaintiff's deposition is not supportive.

1  [such as her] to become technical[.]" Id., exh. 1 (doc. 44-2)

2  thereto (Huynh Dep'n) at 254:17-20.

3      Given these undisputed facts, plaintiff cannot survive summary

4  judgment by relying upon the conclusory statement that she was

5  "nearly entirely denied any training[.]" See Resp. (doc. 46) at

6  10.  Plaintiff's response does not include any cites to the record

7  to support this bald assertion.  And while her SOF does include

8  cites, close scrutiny of the cited portions of the record reveal

9  that those cites do not corroborate that plaintiff was denied

10 training.  The thrust of the cited testimony is that plaintiff had

11 to ask for training, not that she was denied training.  See, e.g.,

12 DSOF, exh. 1 (doc. 44-2) thereto (Huynh Dep'n) at 290:19-23; and

13 217:15-17.  Even construing the record cites in a light most

14 favorable to plaintiff, she has not created a genuine issue of

15 material fact in terms of whether she was denied training.

16 Therefore, plaintiff cannot establish an adverse employment action

17 based on her unsubstantiated allegation that she was denied

18 training.

19     Furthermore, plaintiff has not pointed to any record evidence

20 even hinting that "colleagues in the same position were

21 consistently provided training[]" while she was not.  See Resp.

22 (doc. 46) at 10.  The record cites in PSOF do not mention

23 colleagues.  This omission is significant.  See Herr v. Airborne

24 Freight Corp., 130 F.3d 359, 361 (8th Cir. 1997) (plaintiff

25 alleging, inter alia, inadequate training did not make out prima

26 facie case of gender discrimination where she "presented no

27 evidence that any other probationary driver received more

28 training[]").  The court is thus left with the facts outlined above

1  showing that plaintiff was offered training opportunities, many of
2  which she did not avail herself.  Plainly this does not amount to
3  an adverse employment action, regardless of how broadly defined.
4  See Wyninger v. New Venture Gear, Inc., 361 F.3d 965, 979 (7th Cir.
5  2004) ("insufficient evidence" that female supervisor employee was
6  subjected to an adverse employment action due to inadequate
7  training where although another supervisor "received eleven more
8  hours of formal training" than did plaintiff, she "received at
9  least three-to-four weeks of informal training[,]" and was
10 "introduced" to an "experienced supervisor" with whom she could
11 consult with "problems").

### c.  Corporate Credit Card & Travel Expense Reimbursement

14     Plaintiff alleges that JPMC was "unwilling[] to provide her
15 with a corporate credit card[]" while she "observed that her peers
16 had" one.  Co. (doc. 1) at 4, ¶ 14.  This is not an "adverse
17 employment action," JPMC contends, because in the first instance
18 plaintiff was not denied a credit card.  Rather, there was some
19 delay, which plaintiff rectified, in having her card reinstated
20 after the credit card company had deemed it inactive.  Thus, it is
21 JPMC's position that "[n]either the terms nor conditions of
22 Plaintiff's employment were adversely affected by the delay in her
23 receipt of a corporate credit card."  Mot. (doc. 43) at 11.  JPMC's
24 position is well-taken.
25     In July 2005, when plaintiff filed her first EEOC charge, JPMC
26 first became aware that she was having difficulty obtaining a
27 corporate credit card.  DSOF, exh. 3 (doc. 44-4) thereto (Morton
28 Decl'n) at 10, ¶¶ 53-54.  That difficulty "stemmed from the fact

that [plaintiff] had previously been issued [such] a credit card that was cancelled due to non-use." Id. (doc. 44-4) at 15, ¶ 55; see also DSOF, exh. 1 (doc. 44-2) thereto (Huynh Dep'n) at 135: 12-18. Plaintiff resolved that difficulty by directly contacting the credit card company which reinstated her card. DSOF, exh. 1 (doc. 44-2) thereto (Huynh Dep'n) at 135:15-136:l. 25; see also id., exh. 1 (doc. 44-2) thereto (Huynh Dep'n) at 135:19-21.

In the meantime, when plaintiff's immediate supervisor learned of this, he "obtained permission to place [plaintiff's] business travel expenses on [his] corporate credit card so that [she] would not have to pay out of pocket for her business travel expenses." Id., exh. 5 (doc. 44-5) thereto (Bauer Decl'n) at 18, ¶ 36. According to plaintiff, still, she had to pay out-of-pocket for business travel expenses other than her airfare and accommodations. Id., exh. 1 (doc. 44-2) thereto (Huynh Dep'n) at 131:6-9. Plaintiff readily concedes, however, that she was reimbursed for those out-of-pocket expenses. Id. at 131:9-12.

Further, plaintiff is only speculating that her "peers" did not have to pay out-of-pocket for any of their business travel expenses. See Co. (doc. 1) at 4, ¶ 14. She has not, for example, identified even one "peer" who meets this criteria. "At this summary judgment stage, plaintiff[] cannot rely upon mere conclusory allegations in [her] complaint." Mann v. GTCR Golder Rauner, L.L.C., 483 F.Supp.2d 864, 869 n.5 (D.Ariz. 2007) (citation omitted). Given these undisputed facts, the court finds that any difficulties which plaintiff may have encountered in terms of her corporate credit card did not, as a matter of law, "materially affect" the terms, conditions or privileges of her employment. It

1   necessarily follows, then, that plaintiff has not shown an adverse

2   employment action based upon her alleged denial of a corporate

3   credit card.

### d.  Tuition Reimbursement

5       Similarly unavailing is plaintiff's assertion that she was

6   denied tuition reimbursement, which she "observed that her peers"

7   received, and this constitutes an adverse employment action.  See

8   Co. (doc. 1) at 4, ¶ 14; and at 6, ¶ 24.  After learning of this

9   supposed denial, JPMC investigated, discovering that "some of

10  [plaintiff's] requests for tuition reimbursement had been forwarded

11  to a manager who was no longer with JPMC, thus, the requests went

12  unanswered."  DSOF, exh. 3 (doc. 44-4) thereto (Morton Decl'n) at

13  15, ¶ 56.  Evidently those requests went unanswered because the

14  "new [JPMC] manager" was "not familiar with the [tuition

15  reimbursement] approval processes."  Id., exh. 5 (doc. 44-5)

16  thereto (Bauer Decl'n) at 18, ¶ 35.  Ultimately, in accordance with

17  JPMC policy, plaintiff did receive tuition reimbursement however.

18  Id., exh. 3 (doc. 44-4) thereto (Morton Decl'n) at 16, ¶ 57.  Based

19  upon this more fully developed record, plaintiff's unsubstantiated

20  assertion that she was "denied . . . tuition reimbursement" simply

21  is unfounded.  See PSOF (doc. 47), exh. 2 (doc. 47-3) thereto

22  (Huynh Aff.) at 3, ¶ 7 (emphasis added).

23      Furthermore, as with her credit card allegations, plaintiff

24  has not come forth with any evidence to corroborate her view that

25  "male colleagues were provided tuition reimbursement[]" while she

26  was not.  Id. at 5, ¶ 21 (citing exh 1. (doc. 47-2) thereto (Huynh

27  Dep'n) at 243:20-244:6; and exh. 2 (doc. 47-3) thereto (Huynh Aff.)

28  at 2, ¶ 7).  The cited portions of the record do not support that

assertion.  Without record support, this is nothing more than counsel's unsupported statement, which cannot defeat an otherwise properly supported summary judgment motion.  See Smith, 505 F.2d at 1249.  Under these circumstances the court finds that to the extent plaintiff's tuition reimbursement was delayed, once again, it did not "materially affect" the terms, conditions or privileges of her employment.  At most, this claimed delay was an administrative mistake which JPMC rectified once it became aware of it.  See Tudor Delcey, 2008 WL 123855, at *9 (failure to implement a merit raise is a change in benefits, but it was not an adverse employment action given the evidence "show[ing] that it was an administrative mistake that was rectified once [plaintiff] complained to her manager[]").

### e. Access to Senior Management

Apparently JPMC is moving for summary judgment based upon plaintiff's inability to show that a denial of access to management is an adverse employment action.  Originally JPMC did not analyze that issue, however; instead, it simply listed that claimed denial in summarizing plaintiff's allegations.  See Mot. (doc. 43) at 10.  Plaintiff's response does nothing more than repeat the unsupported allegation that she "was denied access to senior management while her male colleagues were given direct access[.]" Resp. (doc. 46) at 10; and at 4.  Given the manner in which the parties have presented this "denial of access" issue, the court is tempted to disregard altogether this adverse employment action theory.  But, to be thorough, the court will briefly address this issue.

Obviously, JPMC did not meet its initial burden of showing an absence of genuine issue of material fact as to this "denial of

1   access" issue.  Nonetheless, there is merit to JPMC's contention in

2   its reply that "[p]laintiff's vague allegations of exclusion are

3   insufficient to create an issue of fact for trial."  Reply (doc.

4   49) at 5.  Again, plaintiff did not provide any cites to the

5   record, much less a cite showing a genuine issue of material fact.

6   As in James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371 (4th Cir.

7   2004), plaintiff's claim that she was denied access to senior

8   management "lacks specificity, and [s]he fails . . . to

9   substantiate how th[at] alleged [denial], . . . , adversely

10  affected h[er]."  See id. at 377.  Therefore, the court finds that

11  this alleged denial of access to management cannot support a

12  finding of an adverse employment action.

13                      ***f.  Miscellaneous Acts***

14       Understandably, initially JPMC confined its adverse employment

15  action argument to the conduct which plaintiff alleges in her first

16  EEOC Charge and echoes in her complaint.  When plaintiff attempted

17  to defeat summary judgment by listing a host of other supposedly

18  adverse employment actions, JPMC replied by explaining the numerous

19  weaknesses in her contentions.  It is unnecessary to address each

20  of JPMC's numerous objections because whether framed in terms of

21  being "told by management to keep her 'mouth shut[,]'" or in terms

22  of "not provid[ing] Plaintiff with a job description for her new

23  position," plaintiff has not created a factual issue sufficient to

24  overcome summary judgment as to any of these acts.  Adopting JPMC's

25  reasoning, the court finds that whether viewed individually or

26  collectively, none of the acts which plaintiff found objectionable

27  rise to the level of an adverse employment action.  See Reply (doc.

28  49) at 5-8.

1    Garity v. Potter, 2008 WL 872992 (D.Nev. 2008) is particularly

2  instructive in this regard.  Similar to plaintiff Huynh, among

3  other things, the plaintiff in Garity alleged that she was

4  "'berated' in front of her fellow employees, that her supervisor

5  was rude to her, that she was deprived of receiving clear and

6  logical instructions" and that she was put in "no-win

7  situations[.]" Id. at *3.  Based upon those allegations the court

8  found that "[w]hile Plaintiff's . . . subjective experience [w]as

9  . . . painful and difficult, allegations of unfriendly or rude

10  behavior and/or that she experienced a non-ideal work environment

11  [we]re insufficient to establish a prima facie case of racial

12  discrimination under Title VII."  Id. at *4 (citing, inter alia,

13  Baqir v. Principi, 434 F.3d 733, 747 (4th Cir. 2006)).  The same is

14  true here.  The conduct which plaintiff Huynh may find subjectively

15  offensive does not suffice to show an adverse employment action.

16  Further, plaintiff is overlooking the fact that to come within the

17  ambit of an adverse employment action, the conduct must "materially

18  affect" such things as the terms and conditions of employment.  It

19  is not enough that the challenged actions merely affect employment

20  in some relatively inconsequential way.  Without in any way

21  intending to diminish plaintiff's subjective experience, the court

22  agrees with the astute observation of several circuit courts that

23  "not everything that makes an employee unhappy is an actionable

24  adverse action."  See, e.g., Buboltz v. Residential Advantages,

25  Inc., 523 F.3d 864, 868 (8th Cir. 2008) (internal quotation marks

26  and citation omitted); Smart v. Ball State University, 89 F.3d 437,

27  441 (7th Cir. 1996).

28       In sum, although the definition of an adverse employment

- 33 -

1  action is relatively broad, there must be some outer limits.  Here,

2  with one exception, plaintiff has exceeded the scope of what can be

3  considered an adverse employment action.  That exception is

4  plaintiff's reclassification from a Vice President to a Network

5  Engineer.  Because plaintiff is able to defeat summary judgment as

6  to this one form of adverse employment action (reclassification),

7  the court will shift its focus to whether plaintiff can show that

8  similarly situated individuals outside her protected class were

9  treated more favorably.  If she cannot, as JPMC maintains, then

10  JPMC would be entitled to summary judgment.

11         ***3.  Similarly Situated Individuals***

12         Even if plaintiff is able to show, as she has, at least one

13  adverse employment action, JPMC contends that she cannot make out a

14  *prima facie* case because she "cannot identify similarly situated

15  individuals who received more favorable treatment."  Mot. (doc. 43)

16  at 12 (emphasis omitted).  To satisfy this element, plaintiff Huynh

17  must prove that employees "'with qualifications similar to [hers]

18  were treated more favorably[]'" than she was.  See Oshilaja, 2007

19  WL 2903029, at *11 (citing Godwin v. Hunt Wesson, Inc., 150 F.3d

20  1217, 1220 (9th Cir. 1998)).  This showing "does not require that

21  the employees be *identically* situated."  Bowden v. Potter, 308

22  F.Supp.2d 1108, 1117 (N.D.Cal. 2004) (emphasis in original).

23  Rather, what must be shown is that an employee is "'similarly

24  situated in all *material* respects – not in *all* respects.'" Id. at

25  1116 (quoting McGuinness v. Lincoln Hall 263 F.3d 34, 53 (2d Cir.

26  2000))(emphasis in original).  Thus, despite JPMC's contrary

27  assertion, "[t]he employees need not necessarily have the same

28  supervisor, be subject to the same standards, and engage in the

1  same conduct." Id. at 1117.  "The relevance of such factors

2  depends on the circumstances and nature of the case." Id.  As the

3  foregoing makes clear, "[t]he issue of similarly situated status is

4  . . . fact specific and defies a mechanical or formulaic approach."

5  Id.

6      JPMC notes that in her deposition plaintiff identified three,

7  sometimes four, individuals whom she claims were similarly

8  situated, but were treated more favorably then she.  Mot. (doc. 43)

9  at 12 (citing DSOF (doc. 44) at ¶¶ 3 and 4 (citations omitted)).

10  In opposing JPMC's motion, however, plaintiff explicitly asserts

11  that "[i]n all material respects," she was only "similarly situated

12  to Peterson and Hillman [two of her colleagues] prior to the

13  [m]erger[.]"  Resp. (doc. 46) at 12.  Accordingly, the court will

14  confine its similarly situated inquiry to those two individuals.

15      JPMC maintains that prior to the merger neither Peterson nor

16  Hillman were similarly situated to plaintiff because they had

17  skills, knowledge, training, and experience which plaintiff did not

18  have.  It is those differences, JPMC maintains, which resulted in

19  Peterson and Hillman retaining their Vice President titles after

20  the merger while plaintiff did not.

21      As noted earlier, one result of the merger was that the

22  department in which plaintiff had been working pre-merger was

23  subsumed in another department.  Ms. McClung had an integral role

24  in the reclassification of personnel which took place as part of

25  that department merger.  She "had final approval of job titles and

26  assignments and [she] had input over who was assigned to various

27  positions and roles within [her] department."  DSOF, exh. 6 (doc.

28  44-5) thereto (McClung Decl'n) at 30, ¶ 6.  Given those

responsibilities, Ms. McClung had "personal knowledge of the reasons why" Ms. Peterson and Mr. Hillman, among others, "were assigned to the job titles and functions which they were . . . following the merger."  Id. at 32, ¶ 17.

Like plaintiff, Ms. Peterson was "a project/product manager" prior to the merger; but after the merger, unlike plaintiff, she "kept her former title of Vice President[.]" Id. at 33, ¶¶ 34 and 35.  From Ms. McClung's perspective, "[t]he employees in [her] department are required to have technical and engineering knowledge[.]" Id. at 30, ¶ 10.  Someone who does not "know how products work, how they can be supported, or how they are installed[,]" is not, in Ms. McClung's opinion, "qualified to make decisions about what equipment and products are best for the organization."  Id. at 31, ¶ 10.

Elaborating upon Ms. Peterson's technical knowledge, Ms. McClung explained that unlike plaintiff, prior to the merger Ms. Peterson took "it upon herself to learn the technical and engineering aspects of audio and video equipment." Id. at 34, ¶ 36. Therefore, although both Ms. Peterson and plaintiff worked with vendors prior to the merger, in contrast to plaintiff, Ms. Peterson actually "knew how the products worked."  See id.  Ms. Peterson's knowledge of "technical fundamentals of the equipment[]" became evident to Ms. McClung from conversations she had with Ms. Peterson.  See id. at 34, ¶ 37.  In sharp contrast, plaintiff "made it very clear to" Ms. McClung that plaintiff "was not familiar with the technical or engineering aspects of the equipment that she worked with in her . . . role" prior to the merger.  Id. at 30, ¶ 9.

1   Ms. McClung's assessment of Ms. Peterson technical knowledge
2   was confirmed by speaking with an outside vendor's employees who
3   "spoke highly of Peterson and [her] knowledge and skills." Id. at
4   34, ¶ 37.  Ms. Peterson had what Ms. McClung describes as "strong
5   technical skills and she was rated a higher level engineer than
6   [plaintiff] because Peterson had multiple levels of technical
7   competency." Id. at 34, ¶ 38.  Therefore, because "technical and
8   engineering skills are very important within the Global Voice
9   Department," Ms. McClung explains that Ms. Peterson "was given a
10  job tile that carried with it the officer title of Vice President."
11  Id.   Succinctly put, as the foregoing shows, Ms. Peterson retained
12  her Vice President title because she had technical knowledge which
13  plaintiff did not.
14      Likewise, according to Ms. McClung, Mr. Hillman, who works in
15  the United Kingdom, "was given the title of Infrastructure
16  Director, which had an officer title of Vice President, because of
17  his experience and superior technical skills[.]" Id. at 35, ¶ 46.
18  Ms. McClung describes Mr. Hillman as a "highly technical
19  individual[.]" Id. at 34, ¶ 41.  Indeed, Mr. Hillman "is regarded
20  as a driving force in the technology industry, especially within
21  the Polycom users group in the United States and in Europe, the
22  Middle East, and Africa." Id.  This can be seen from the fact that
23  Hillman "is a former President and current Vice President of a
24  Polycom User's Group in the United Kingdom." Id. at 35, ¶ 43.
25  Additionally, Ms. McClung had "heard good feedback about Hillman
26  from his peers, and he was known at the executive level" of the
27  JPMC entity as it existed prior to the merger." Id. at 35, ¶ 44.
28  Plaintiff had none of these attributes.  She was "not well-known"

to those executives, "and she [wa]s not a well-known figure within

the Polycom industry." Id. at 35, ¶ 45.  Nor, as previously

discussed, did plaintiff have technical experience, much less being

considered "a driving force in the technology industry[.]" See id.

at 34, ¶ 41.

Despite the foregoing, plaintiff steadfastly maintains that

she, Ms. Peterson and Mr. Hillman were similarly situated prior to

the merger.  From plaintiff's viewpoint, those similarities are as

follows.  She, Ms. Peterson, and Mr. Hillman all had the same

title, Vice President, and were all "Officers of the Company[.]"

Resp. (doc. 46) at 12.  Purportedly all three also "managed other

employees;" and "were paid base salaries plus year-ending

bonuses[.]" Id.  Other similarities, according to plaintiff, are

that "all three oversaw Defendants' audio - and videoconferencing

functions throughout the world; and all . . . had been promoted to

their respective Vice President positions based on prior employment

with the Defendant." Id.

There are several flaws in plaintiff's argument.  The first

and perhaps most fundamental flaw is that plaintiff did not provide

cites to the record to support these claimed similarities.  This

"absence of cites to the record is fatal to plaintiff['s]

opposition." See Mann, 483 F.Supp.2d at 872-873.  "At the very

least, as the party opposing summary judgment, plaintiff[] must

'designate specific facts showing that there is a genuine issue for

trial.'" Id. at 873 (quoting Celotex, 477 U.S. at 324, 106 S.Ct.

2548, 91 L.Ed.2d 265) (emphasis added by Mann court).

"Plaintiff[] cannot defeat this summary judgment motion by relying

upon blanket, unsupported assertions or declarations in their

opposing memorandum of law." <u>Id.</u> (citing <u>Mack Trucks</u>, 505 F.2d at
1249 ("[A] [l]egal memorand[um] . . . , in the summary-judgment
context, [is] not evidence, and do[es] not create issues of fact
capable of defeating an otherwise valid motion for summary
judgment.")) "That is so in part because 'the arguments and
statements of counsel are not evidence and do not create issues of
material fact capable of defeating an otherwise valid motion for
summary judgment.'" <u>Id.</u> (quoting <u>Barcamerica Intern. v. Tyfield
Importers, Inc.</u>, 289 F.3d 589, 593 n. 4 (9th Cir. 2002) (internal
quotation marks and citation omitted)).  Moreover, it is the
nonmoving party's obligation, not the court's, "'to identify with
reasonable particularity the evidence that precludes summary
judgment.'" <u>Mann v. GTCR Golder Rauner, L.L.C.</u>, 483 F.Supp.2d 884,
891 (D.Ariz. 2007) (quoting <u>Keenan v. Allan</u>, 91 F.3d 1275, 1279
(9th Cir. 1996)).  Plaintiff Huynh has not fulfilled that
obligation.

     Assuming <em>arguendo</em> that the record evidence supports these
claimed similarities, nevertheless, plaintiff cannot defeat JPMC's
motion because she has not made out a <em>prima facie</em> case of disparate
treatment.  JPMC has submitted undisputed evidence that Hillman and
Peterson were not similarly situated to plaintiff Huynh in that
they both had technical skills, knowledge and experience which she
did not.  Plaintiff did not even attempt to show that she was
similarly situated in that critical "material respect."  Indeed,
plaintiff would be hard pressed to do so given her stance all along
that she was not qualified for her reclassified position as a
Network Engineer because of her lack of technical and engineering
experience.

1    Another flaw in plaintiff's opposition is that she has not

2   shown that either Peterson or Hillman were "outside her protected

3   class," *i.e.* Asian, in terms of race.  According to JPMC, Ms.

4   Peterson is a "United States immigrant[,]" but it is impossible to

5   discern her race from that statement.  DSOF (doc. 44), exh. 6 (doc.

6   44-5) thereto (McClung Decl'n) at 31, ¶ 15.  Admittedly, neither

7   Hillman nor Peterson are Asian surnames, but that is not

8   necessarily determinative of their race.  They could be adoptees;

9   and if so, they could be of Asian race, but have non-Asian

10  surnames.  They also could be Asian and have taken non-Asian

11  surnames through marriage.  Plainly the court is speculating, but

12  that is the point.  Because the record is silent as to the race of

13  Hillman and Peterson, the court cannot engage in any meaningful

14  analysis in this regard.  <u>See</u> <u>Rutenschroer v. Starr Seigle</u>

15  <u>Communications, Inc.</u>, 484 F.Supp.2d 1144, 1156 (D.Hawai'i 2006)

16  (court could not "compare the treatment of similarly-situated non-

17  black employees" to African-American plaintiff because she did not

18  "present[] . . . specific evidence regarding the race or color of

19  the other employees[]").  What is more, the fact that Ms. Hillman,

20  who retained her Vice President title, is a female severely

21  undermines plaintiff's assertion that plaintiff was reclassified to

22  a non-Vice President position because of her gender.

23    The court is cognizant that "whether two employees are

24  similarly situated is ordinarily a question of fact."  <u>Beck v.</u>

25  <u>United Food and Commercial Workers Union</u> 506 F.3d 874, 885 n.5 (9th

26  Cir. 2007) (citations omitted).  Where, as here, however, plaintiff

27  has not come forth with any evidence that similarly situated

28  individuals, *i.e.* persons with a similar lack of technical

- 40 -

knowledge, skills and experience, were treated more favorably than her, plaintiff cannot meet her minimum burden of establishing a *prima facie* case of disparate treatment.  See Leong v. Potter, 347 F.3d 1117, 1124 (9th Cir. 2003) (plaintiff failed to establish *prima facie* case of Title VII discrimination because he did not provide evidence that similarly situated individuals were treated more favorably).

Until now the court has deliberately focused on plaintiff's primary argument that she was similarly situated to Hillman and Peterson prior to the merger, yet she was treated less favorably to them after the merger.  Plaintiff is also suggesting, though, that after the merger she was treated less favorably than similarly situated individuals.  This argument fails as well.  Plaintiff states that JPMC "has conspicuously not stated . . . that Peterson and Hillman were denied corporate credit cards, or tuition reimbursement, or any other indicia of the Vice President and officer positions[.]"  Resp. (doc. 46) at 13).  Plaintiff has it backwards.  It is her burden to show that after the merger there were other similarly situated individuals, *i.e.* those in the Network Engineer position, or who were otherwise similarly situated to her in all material respects, who received those benefits.  Clearly after the merger neither Hillman nor Peterson were similarly situated to plaintiff in that they held different positions than did plaintiff, and in the post-merger hierarchy, they were at a managerial level, whereas plaintiff was not.  See Vasgez, 349 F.3d at 641 (footnote omitted) ("Employees in supervisory positions are generally deemed not to be similarly situated to lower level employees.")  Hence, whether or not Hillman

1 and Peterson, who clearly were not similarly situated to plaintiff

2 after the merger, received benefits such as tuition reimbursement,

3 is irrelevant.

4      To be sure, "[t]he requisite degree of proof necessary to

5 establish a *prima facie* case for Title VII . . . claims on summary

6 judgment is minimal[.]" <u>Team Electric</u>, 520 F.3d at 1089 (internal

7 quotation marks and citation omitted).  Nonetheless, at the end of

8 the day plaintiff cannot overcome JPMC's summary judgment motion on

9 the similarly situated element because the record is devoid of any

10 evidence that non-Asian, male employees with a similar lack of

11 technical experience received more favorable treatment than did

12 plaintiff.  <u>See</u> <u>Lyons v. England</u>, 307 F.3d 1092, 1113 (9th Cir.

13 2002) ("A plaintiff's failure to offer evidence establishing a

14 necessary element of his *prima facie* case will ordinarily be fatal

15 to his claim.")   What is more, as will be seen, even if plaintiff

16 established a *prima facie* case, she is unable to rebut JPMC's

17 legitimate, non-discriminatory reason for not placing her in a Vice

18 President position post-merger.

19      ***D.  Legitimate, Nondiscriminatory Reason***

20      Once the plaintiff establishes a *prima facie* case, "the burden

21 . . . shifts to the defendant to articulate a legitimate,

22 nondiscriminatory reason for its allegedly discriminatory

23 . . . conduct."  <u>Surrell</u>, 518 F.3d at 1106 (citation omitted).

24 This burden is one of production, not persuasion; it involves no

25 credibility assessment.  <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>,

26 530 U.S. 133, 142 (2000) (citation omitted).

27      Having found that plaintiff's reclassification is the only

28 viable adverse employment action here, the court's inquiry is

1  narrow – can JPMC articulate a legitimate, non-discriminatory
2  reason for reclassifying her from a Vice President to a Network
3  Engineer.  See Chuang v. University of California Davis, 225 F.3d
4  1115, 1126 (9th Cir. 2000) (citations omitted) (emphasis added)
5  ("Because the [plaintiffs] established a prima facie case for the
6  first two claims, the burden of production shifts to [defendant] to
7  articulate a nondiscriminatory reason for each adverse employment
8  action.")  As fully detailed in the declarations of several JPMC
9  employees, JPMC readily satisfies this burden.  Namely, plaintiff's
10  former position did not exist in the newly merged corporation; so,
11  she was reclassified to the position which most closely aligned
12  with her former job responsibilities – that of Network Engineer.
13  DSOF, exh. 3 (doc. 44-4) thereto (Morton Decl'n) at 2-4, ¶¶ 8-18;
14  exh. 5 (doc. 44-5) thereto (Bauer Decl'n) at 1, ¶ 4; at 2, ¶¶ 5;
15  10-11; and at 3, ¶ 14; exh. 6 (doc. 44-5) thereto (McClung Decl'n)
16  at 30-31, ¶¶ 4-10; and at 35, ¶¶ 48-49.  Indeed, the alternative to
17  reclassifying plaintiff was terminating her.  Id., exh. 3 (doc. 44-
18  4) thereto (Morton Decl'n) at 9, ¶ 16; exh. 6 thereto (doc. 44-5)
19  (McClung Decl'n) at 35, ¶ 49.
20     An additional reason for plaintiff's reclassification was her
21  "lack of technical training and experience[.]" Id., exh. 3 (doc.
22  44-4) thereto (Morton Decl'n) at 9, ¶ 17.  Ms. Morton, who was part
23  of a team of managers who assessed plaintiff's "Biography Form and
24  the job requirements of the available positions" within the merged
25  organization, opines that "it would not have been in the best
26  interest of the firm to assign [plaintiff] the job of managing
27  technical engineers when she did not personally have technical or
28  engineering experience."  Id. at 8, ¶ 14; and at 9, ¶ 17.  Not only

1  did plaintiff lack the requisite technical background, but she also

2  lacked the necessary management skills.  Ms. Morton explains that

3  although in her "Biography Form, [plaintiff] indicated that she had

4  over 10 years of management experience[,] [u]pon closer

5  examination, [plaintiff] had not even been in the workforce for 10

6  years at that time[.]" Id. at 9, ¶ 18.  Her "actual 'management'

7  experience was limited to less than 5 years, and she primarily

8  managed outside vendors, not employees."  Id.  Based upon the

9  foregoing, JPMC has met its burden of production.

10     **_E.  Pretext_**

11     "If the employer articulates a legitimate reason for its

12  action," as JPMC has, "the presumption of discrimination drops out

13  of the picture, and the plaintiff may defeat summary judgment by

14  satisfying the usual standard of proof required . . . under Fed. R.

15  Civ. P. 56(c)." See Surrell, 518 F.3d at 1106 (internal quotation

16  marks and citations omitted).  A plaintiff proceeding on a

17  disparate treatment theory satisfies that burden by showing "that

18  the reason is pretextual either directly by persuading the court

19  that a discriminatory reason more likely motivated the employer _or_

20  indirectly by showing that the employer's proffered explanation is

21  unworthy of credence." Team Electric, 520 F.3d at 1089 (internal

22  quotation marks and citations omitted) (emphasis added).  As to the

23  latter, an "employer's proffered explanation is 'unworthy of

24  credence because it is internally inconsistent or otherwise not

25  believable[.]" Noyes v. Kelly Services, 488 F.3d 1163, 1170 (9th

26  Cir. 2007) (internal quotation marks and citations omitted).

27     This Circuit has not yet "clearly resolved" the issue of

28  whether a plaintiff "must offer 'specific' and 'substantial'

circumstantial evidence of pretext, or whether a lesser amount should suffice."[6]  Team Electric, 520 F.3d at 1091 (footnote omitted).   What is clear, however, is that a plaintiff "must prove by a *preponderance of the evidence* that the reason asserted by the defendant[]s is a mere pretext."  Community House, Inc. v. City of Boise, 490 F.3d 1041, 1053 (9th Cir. 2007) (citation omitted) (emphasis added).

As part of plaintiff's burden, JPMC indicates that she must also show by a preponderance of the evidence that its reasons for reclassifying her "are not true."  Mot. (doc. 43) at 16 (citation omitted).   The Ninth Circuit in Noyes expressly rejected this "enhanced burden to show pretext[,]" however.  Noyes, 488 F.3d at 1170.  In so doing, it "reiterate[d] that at the summary judgment stage, a plaintiff may raise a genuine issue of material fact as to pretext via (1) direct evidence of the employer's discriminatory motive or (2) indirect evidence that undermines the credibility of the employer's articulated reasons."  Id. at 1170-71 (citations omitted).  Plaintiff Huynh has done neither.

In the absence of any direct evidence of racial or gender animus, plaintiff is attempting to establish pretext indirectly.  Many of the incidents which plaintiff believes were adverse employment actions also, from her viewpoint, are indirect evidence of pretext.  Plaintiff harkens back to her belief that she (1) was placed in a position for which she was not qualified; (2) not given

---

[6]     Compare Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1030 (9th Cir. 2006) ("[I]n the context of summary judgment, Title VII does not require a disparate treatment plaintiff relying on circumstantial evidence to produce more, or better, evidence than a plaintiff who relies on direct evidence.") with Dominguez-Curry v. Nev. Transp. Dep't, 424 F.3d 1027, 1038 (9th Cir. 2005) (circumstantial evidence of discriminatory motive must "be both specific and substantial").

a job description; (3) not trained; (4) told to "keep her mouth shut[;]" and (4) "'black list[ed]'" when she complain[ed][.]" Resp. (doc. 46) at 15.  After listing those purported actions by JPMC, plaintiff declares that its "actions are internally inconsistent with its proffered explanation and unworthy of credence."  Id. at 16 (internal quotation marks and citation omitted).

Assuming *arguendo* that all of the foregoing is properly considered on this motion, nevertheless, plaintiff utterly fails to explain how this proof is "internally inconsistent and unworthy of credence."  See id.  Plaintiff cannot meet her burden of showing "mere pretext" simply by reciting the phrase "internally inconsistent and unworthy of credence."  She must do more. Plaintiff must demonstrate how that conduct is "internally inconsistent" with JPMC's proffered reasons for reclassifying her, or why it is "unworthy of credence."  Plaintiff has not done that. Indeed, plaintiff would be hard pressed to argue that JPMC's reasons for reclassifying her are "unworthy of credence" given that she did not depose any of the JPMC employees whose declarations are part of this record.  Without some explanation from plaintiff, the court is at a loss to see how the listed acts create a genuine issue of fact as to pretext.

Furthermore, plaintiff's own subjective belief that she was unqualified to be a Network Engineer does not create a factual issue as to pretext.  See Bradley v. Harcourt, Brace & Co., 104 F.3d 267, 270 (9th Cir. 1996) ("[A]n employee's subject personal judgments of her competence alone do not raise a genuine issue of material fact.").  This is all the more so given the ample undisputed evidence discussed earlier showing that plaintiff was

1    reclassified as a Network Engineer because that position was most

2    closely aligned with her job junctions prior to the merger.

3         Plaintiff seems to suggest that the "revo[cation]" of her

4    "credit card privileges, which were enjoyed by [her] peers in her

5    new position," and the "further revo[cation] [of] her tuition

6    reimbursement[]" also were "internally inconsistent" with JPMC's

7    reasons for reclassifying her.  See id. at 16 (citation omitted).

8    Again, the court fails to see the asserted "internal

9    inconsistency."

10        In any event, this is a blatant misstatement of the facts.  As

11   previously discussed, plaintiff's credit card was not revoked; it

12   was placed on inactive status due to lack of use.  No reasonable

13   trier of fact could draw an inference of discriminatory motive on

14   this record as it pertains to plaintiff's access to a corporate

15   credit card.  Additionally, plaintiff has not shown that her

16   "peers" had a credit card while she did not.  This lack of proof

17   further undermines plaintiff's theory that she was discriminated

18   against on the basis of her race and gender.

19        Further, on the record as developed there is absolutely no

20   basis for plaintiff's statement that her tuition was revoked.

21   Rather, as already explained, plaintiff's request for tuition

22   reimbursement was not timely processed due to the new manager's

23   unfamiliarity with the approval process.  As with the corporate

24   credit card, no reasonable inference of discriminatory motive can

25   be drawn from this record with respect to tuition reimbursement.

26        While "the burden on [a] plaintiff[] to raise a triable issue

27   of fact as to pretext is hardly an onerous one[,]" plaintiff Huynh

28   has not met even that relatively minimal burden.  See Noyes, 488

F.3d at 1170 (internal quotation marks and citation omitted).  She

has pointed to nothing indicating that her reclassification

improperly stems from her race or her gender, as opposed to her

lack of qualifications.  The inferential leap which plaintiff urges

this court to make is simply too great.  At best, plaintiff is left

with her own "uncorroborated and self-serving" statements as to

JPMC's discriminatory motive; "without more," those statements

"will not create a genuine issue of material fact precluding

summary judgment."  See Mann, 483 F.Supp.2d at 890.  Simply put,

plaintiff has not satisfied her ultimate burden of persuasion; no

reasonable trier of fact could draw an inference of racial or

gender discrimination on this record.

### III.  *Motion to Strike Affidavit of Cinyi Wang*

In a last ditch effort to create a fact issue regarding

pretext, plaintiff is attempting to rely upon what is colloquially

referred to as "me too" evidence.  More specifically, plaintiff is

relying upon the affidavit of Cinyi Wang another Asian female who

prior to the merger also held a Vice President position.  Ms. Wang,

in language strikingly similar to that in plaintiff's affidavit,

avers that post-merger she was "stripped" of her Vice President

title; not provided with a job description for her new position;

"received no direction from [her] manager about her job duties and

responsibilities, and was not provided . . . performance reviews

that were provided to other employees[.]" PSOF (doc. 47), exh. 7

(doc. 47-3) thereto (Wang Aff.) at 20, ¶ 7.  Ms. Wang further avers

that her training requests were denied, and that she sought intra-

company transfers for positions where she believed her "skills

could be better utilized[,]" but was informed "that there were no

1   other positions available for [her] at [JPMC]." <u>Id.</u> at 20, ¶ 8.

2   Ms. Wang was terminated on August 1, 2005. <u>Id.</u> at 20, ¶ 11.

3       JPMC contends that because plaintiff (1) did not timely

4   disclose Ms. Wang's affidavit; (2) did not "properly disclose [h]er

5   as a witness[;]" and (3) because this affidavit is "confusing and

6   misleading[,]" the court should strike it.  Mot. (doc. 48) at 1.

7   Plaintiff maintains that she did properly disclose Ms. Wang and,

8   what is more, her affidavit "is relevant and non-prejudicial[.]"

9   Resp. (doc. 53) at 6.  Therefore, the court should deny JPMC's

10  motion to strike.

11      ***A.  Disclosure***

12      JPMC indicates that plaintiff "never disclosed [Ms.] Wang in a

13  disclosure statement[.]" Mot. (doc. 48) at 2.  As it turns out

14  though, Ms. Wang was disclosed, but not accurately.  In her July

15  14, 2006, Initial Disclosure Statement, due to a "clerical error"

16  plaintiff identified "Lin Yi Wang[,]" not Cinyi Wang, as one of

17  several "individual[s] likely to have discoverable information[.]"

18  Resp. (doc. 53), exh. 1 thereto (doc. 53-2) at 3, ¶ 2.  Clerical

19  errors aside, undeniably, that Statement did not include Ms. Wang's

20  address or phone number, as Rule 26(a)(1) contemplates.[7]  Instead,

21  plaintiff indicated that Ms. Wang could be contacted "c/o" JPMC's

22  law firm, and she provided that firm's address and telephone

23  number.  <u>See</u> <u>id.</u>

24      In addition to plaintiff and Ms. Wang, in her Initial

25  Disclosure Statement, plaintiff identified seven other

26  "individual[s] like to have discoverable information." <u>Id.</u> at 3-5,

27  _____

28      [7]    That Rule provides that "if known," the address and telephone number
    of an individual identified thereunder must be provided.  Fed. R. Civ. P.
    26(a)(1)(A).

1  ¶¶ 3-9.  Plaintiff's description of their anticipated testimony is
2  virtually identical.  Plaintiff generically stated that Ms. Wang,
3  like the other identified individuals, would testify regarding
4  "general working conditions. . . job benefits, . . . knowledge of
5  Plaintiff[.]"  Id. at 3, ¶ 2.  Significantly, no mention is made in
6  that summary that Ms. Wang also claims to have been discriminated
7  against by JPMC because she is an Asian woman.

8      As part of the discovery process, JPMC served plaintiff with
9  interrogatories and a request for document production.  When
10 plaintiff responded on October 2, 2006, she had not yet had any
11 contact with Ms. Wang.  Nor at that juncture, plaintiff claims, did
12 she have any documents which were responsive to document requests 3[8]
13 and 14.[9]  Therefore, during discovery the only mention of Ms. Wang
14 was in that Initial Disclosure Statement and at plaintiff's
15 deposition.

16     In particular, during her February 7, 2007, deposition, which
17 was continued on March 27, 2007, plaintiff "clarified" Ms. Wang's
18 "actual name and identity[.]" Resp. (doc. 53) at 3.  When directly
19 asked about the name "Lin Yi Wang" on her Initial Disclosure
20 Statement, plaintiff responded, "It should be . . . Cin Yi Wang, C-
21 i-n-y-I."  Id. at 4.  Additionally, plaintiff testified that Ms.
22 Wang was "the other Asian VP at Chase[,]" and that she "was treated
23 the same way" as plaintiff in that "she was stripped of her VP

24

25 _____

26     [8]    Basically that request directed plaintiff to produce all documents
relevant to any of the claims in her complaint, "including . . . all documents
concerning any communication with any other person concerning your claims[.]" Mot.
27 (doc. 48) at 2.

28     [9]    This similarly broad request directed plaintiff to "[p]roduce all
statements, . . . , obtained by you or your agent from any other person that are
in any way related to the allegations in your Complaint."  Mot. (doc. 48) at 2.

title and assigned clerical work."   Id. at 5 (citation omitted).

March 30, 2007, was the court ordered deadline for non-expert discovery.  Doc. 17 at 2, ¶ 4.  Two weeks later, on April 13, 2007, Ms. Wang executed an affidavit "specifically for the purpose of opposing [JPMC's] anticipated motion for summary judgment."  Resp. (doc. 53) at 5.  Evidently JPMC was not made aware of that affidavit, however, until June 18, 2007, when plaintiff filed it in opposition to this summary judgment motion.

JPMC claims "severe[] prejudice[]" if the court considers Ms. Wang's affidavit because, first, it has "not had the opportunity to examine [her] regarding the allegations [there]in . . . or to conduct discovery regarding the reasons for the employment decisions that affected Wang."  Reply (doc. 56) at 3.  Second, although plaintiff indicated that Ms. Wang could be contacted "c/o" JPMC's law firm, JPMC states that "[d]espite the inquiry of [its] counsel," it was unable "to locate an employee or former employee of [defendant] named 'Lin Yi Wang.'"  Id. at 2.  Third, JPMC objects because "plaintiff never disclosed that she intended to offer any testimony by Wang or anyone else indicating that Wang experienced race or sex discrimination as a result of conduct by [JPMC]."  Id.  Fourth, even though plaintiff became aware at her February, 2007 deposition (less than two months prior to the close of non-expert discovery) that her prior disclosure regarding Ms. Wang was not accurate, JPMC points out that she did not supplement her prior disclosures "revealing the true substance of Wang's intended testimony, nor did she submit a telephone number or address for Wang (who no longer worked for or was accessible to [it][.]"  Id. at 3.

1   Information that "without substantial justification" is not

2   disclosed as Rule 26(a)[10] and 26(e)(1)[11] mandates, or amended

3   pursuant to Rule 26(e)(2), may not, "unless such failure is

4   harmless," be used as evidence on a motion.  Fed. R. Civ. P.

5   37(c)(1).[12]  Because it will be "prejudiced" by consideration of

6   Ms. Wang's affidavit, JPMC is taking the position that the court

7   "must" exclude that affidavit.  Mot. (doc. 48) at 3 (citation

8   omitted).  To support this mandatory exclusion argument, JPMC

9   relies upon three cases, all of which involved failure to timely

10  disclose with respect to expert witnesses.  See Yeti by Molly, Ltd.

11  v. Deckers Outdoor Corp., 259 F.3d 1101 (9th Cir. 2001); Continental

12  Laboratory Products, Inc. v. Medax International, Inc., 195 F.R.D.

13  675 (S.D.Cal. 2000); and Elgas v. Colorado Belle Corp., 179 F.R.D.

14  296 (D.Nev. 1998).  Plainly Ms. Wang is not an expert witness.

15  Therefore, JPMC's reliance upon those cases is misplaced.

16  Nonetheless, for the reasons set forth below, in the exercise of

17  its discretion the court will exclude Ms. Wang's affidavit.  See

18  Yeti, 259 F.3d at 1106 (citation omitted) (district courts have

19  "particularly wide discretion. . . to issue sanctions under Rule

20  37(c)(1)[]").

21  Based upon Rule 26(e)(2), plaintiff "does not believe" she

22  "was under any continuing obligation," especially after the close

23  ─────────────

24  [10]   This Rules governs "required disclosures[,]" including "[i]nitial
    [d]isclosures."  Fed. R. Civ. P. 26(a)(1).

25  [11]   This Rule pertains to a party's duty to supplement the disclosures
    mandated under subdivision (a).

26  [12]   The Federal Rules of Civil Procedure were amended effective December
27  1, 2007, and "govern in all proceedings thereafter commenced and, insofar as just
    and practicable, all proceedings then pending."  Fed. R. Civ. P. Order of April 30,
28  2007, ¶ 3 (emphasis added).  The court finds that it is "just and practicable" to
    apply the Federal Rules as they read prior to December 1, 2007, because the pending
    motions were filed before that date.

1  of discovery, to amend her response to JPMC's document request to

2  identify Ms. Wang's affidavit.  Resp. (doc. 53) at 5.  Moreover,

3  given plaintiff's deposition testimony highlighted above, plaintiff

4  is taking the position that JPMC "can hardly claim . . . unfair[]

5  surprise[]'" due to Ms. Wang's affidavit."  Resp. (doc. 53) at 5

6  (internal quotation marks omitted).

7       Plaintiff's argument that she had no duty to supplement after

8  the close of discovery is somewhat disingenuous.  In Episcopo v.

9  General Motors Corp., 2004 WL 628243 (N.D.Ill. 2004), upon which

10 JPMC is relying, responding to a summary judgment motion, plaintiff

11 moved to strike a document which defendant had not produced during

12 discovery.  Like plaintiff Huynh, the defendant in Episcopo argued

13 that it was "impossible" to produce the document during discovery

14 because it was not created until after the close of discovery.  See

15 id. at *6.  The Episcopo court soundly reasoned that "[a]lthough

16 Rule 26 does not explicitly provide for supplementation of

17 disclosures and responses after the close of discovery, . . . the

18 language of Rule 26(e)(2) is broad enough to require supplemental

19 disclosure under certain circumstances, regardless of whether

20 discovery has closed[.]"  Id.

21      The court further reasoned that a continuing duty to

22 supplement under those circumstances was "consistent with the

23 spirit behind the discovery rules, which is to promote liberal

24 discovery responses in an effort to narrow the issues for trial and

25 to prevent unfair surprise.'"  Id. (internal quotation marks

26 omitted) (citing, inter alia, Fed. R. Civ. P. 26, Advisory

27 Committee Notes, 1993 Amendments, Subdivision (e)). That reasoning

28 applies with equal force here.  Plaintiff cannot be allowed to

1  circumvent the liberal discovery rules by conveniently waiting

2  until two weeks after the close of discovery to request a

3  supporting affidavit from a potential witness  – a witness she

4  identified, albeit inaccurately, at the outset of discovery.

5       Furthermore, plaintiff has not shown "substantial

6  justification" for not timely disclosing that she intended to rely

7  upon Ms. Wang's statement that allegedly JPMC discriminated against

8  here based upon her race and gender.  Nor has plaintiff shown, as

9  she must, that her failure to timely disclose the existence of Ms.

10  Wang's affidavit was "harmless."  See Yeti, 259 F.3d at 1107

11  ("burden is on the party facing sanctions to prove harmlessness[]"

12  under Rule 37(c)(1)).  For the reasons outlined above, the court

13  grants JPMC's motion to strike the affidavit of Cinyi Wang (doc.

14  48); and necessarily plaintiff cannot rely upon this affidavit to

15  attempt to show pretext.[13]

16       To summarize, IT IS HEREBY ORDERED that:

17       (1) "Defendant's Motion to Strike Inadmissible Evidence

18  Presented by Plaintiff in Response to Motion for Summary Judgment"

19  (doc. 50)is GRANTED in part and DENIED in part; it is GRANTED with

20  respect to the supplemental affidavit of Toni Huynh (doc. 47-3),

21  but DENIED in all other respects;

22       (2) "Defendant's Motion for Summary Judgment" (doc. 43) is

23  GRANTED; and

24       (3) "Defendant's Motion to Strike Affidavit of Cinyi Wang"

25  (doc. 48) is GRANTED.

26

27       [13]    The court's decision to strike Ms. Wang's affidavit for failure to
28  timely disclose obviates the need to address JPMC's additional argument that the
   court should not consider that affidavit because it is irrelevant and prejudicial.

1        The Clerk of the Court is directed to enter JUDGMENT in favor

2   of defendant and terminate the case.

3        DATED this 17th day of July, 2008.

4

5

6   _____

7                Robert C. Broomfield

8                Senior United States District Judge

9

10

11

12

13   Copies to counsel of record

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28